Jessica BRIMMER, Adam Brimmer, by and through their parents, David and Wendy Brimmer, and David Brimmer and Wendy Brimmer, individually, Plaintiffs,

v.

The TRAVERSE CITY AREA PUBLIC SCHOOLS, Peter Wharton, in his official capacity as Superintendent of The Traverse City Area Public Schools, The Traverse Bay Intermediate School District, Michael D. McIntyre, in his official capacity as Superintendent of The Traverse Bay Intermediate School District, jointly and severally, Defendants.

No. 1:94–CV–195.

United States District Court,
W.D. Michigan,
Southern Division.

Sept. 23, 1994.

Thomas M. Schraw, Boyne City, MI, for plaintiffs.

Kurt D. Hassberger, Rhoades, McKee, Boer, Goodrich & Titta, Grand Rapids, MI, for defendants.

## OPINION OF THE COURT

McKEAGUE, District Judge.

This is an action for judicial review under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1415(e). The decision at issue requires that special education services be provided to hearing impaired minors, Jessica and Adam Brimmer, in their resident school district, Traverse City, instead of at the Michigan School for the Deaf in Flint, where they have been educated for the last three years. The state-level decision is an affirmance of the local hearing officer's decision which approved the Individualized Educational Program (IEP) formulated at the local school district level. The decision represents a determination that facilities and programs for the hearing impaired in the Traverse City Area Public Schools have been upgraded, so as to enable the provision of a free appropriate public education to the Brimmer children in an environment less restrictive than the Michigan School for the Deaf. Plaintiffs, the two Brimmer children and their parents, challenge the IEP decision on procedural and substantive grounds.

On June 30, 1994, the Court denied plaintiffs' motion for leave to present additional evidence. The Court now undertakes review based on the administrative record, the parties' briefs and oral arguments of counsel, heard on August 29, 1994.

## I. STANDARD OF REVIEW

The applicable standard of review has been characterized as "modified *de novo* review." *Doe v. Bd. of Educ. of Tullahoma City Schools,* 9 F.3d 455, 458 (6th Cir.1993). Whether a school district has complied with the applicable procedural requirements is a question subject to *de novo* review, but the Court must give "due weight" to the state administrative proceedings. *Id.; Thomas v. Cincinnati Bd. of Educ.,* 918 F.2d 618, 624 (6th Cir.1990). The procedural sufficiency of the IEP is subject to strict review, but merely technical deviations do not warrant judicial interference. *Doe By and Through Doe v. Defendant I,* 898 F.2d 1186, 1190 (6th Cir. 1990). The Court should not exalt form over substance. *Id.* Further, the factfinding of the state agency with expertise in the field is entitled to due respect. *Thomas, supra,* 918 F.2d at 624. The substantive decisions of educators and parents in fashioning IEPs are entitled to the utmost deference, once it is determined that they stem from adherence to the procedural requirements. *Doe By and Through Doe, supra,* 898 F.2d at 1198–99.

The party challenging the terms of an IEP bears the burden of proving by a preponderance of the evidence that the IEP is the product of defective procedure or is substantively inappropriate. *Tullahoma City Schools, supra,* 9 F.3d at 458.

## II. PROCEDURAL OBJECTIONS

### A. Hearing Officer Selection

Under 20 U.S.C. § 1415(b)(2), parents of a handicapped child who object to the educational placement of the child "shall have an opportunity for an impartial due process hearing," as determined by state law. Plaintiffs contend this requirement was violated when they were denied the opportunity to participate in the selection of an impartial hearing officer, as required by state regulation. The state rule provides in pertinent part as follows:

> The superintendent of the public agency shall contract for the services of an impartial hearing officer who is mutually agreeable to both parties or who has been appointed by the department [of education].

If the parent and the public agency cannot agree on a hearing officer, the superintendent shall request that the department appoint an impartial hearing officer.

1987 Annual Administrative Code Supplement, R 340.1724a.

It is undisputed that the school district in this case requested the Department of Education to appoint a hearing officer before any attempt was made to identify a mutually agreeable hearing officer. The question posed is whether the first sentence of Rule 340.1724a impliedly requires the parties to try to reach agreement before resort to the appointment method set forth in the second sentence.

The first sentence of § 1724a indicates generally that the hearing officer may be selected by mutual agreement *or* by appointment. Neither it, nor the second sentence expressly requires that the parties try to reach agreement as a prerequisite to appointment. Neither sentence suggests that appointment is proper only when the parties disagree. The second sentence may be construed simply as explaining that, *if* the parties try to reach agreement and fail, the disagreement will not become an impasse, but will be resolved through the appointment method. This construction best lends integrity to the first sentence. If the second sentence were intended to modify the first, so as to provide that appointment is proper only after the parties have tried to agree and failed, that intent can be expected to have been more clearly stated.

Moreover, to the extent that the parents' full participation in the proceedings below *may* be viewed as having been infringed, the error would appear to have been cured through their motion to disqualify presented to the local hearing officer appointed by the Department of Education, which permitted the issue of hearing officer bias to be addressed and resolved.

Ultimately, the appointment of Local Hearing Officer Frank J. Wawrzaszek was in accord with the first sentence of § 1724a. The argument that the manner or timing of the appointment was a procedural violation is either based on an erroneous interpretation of § 1724a or points at worst to a mere technical violation that does not warrant judicial interference. See *Doe By and Through Doe, supra,* 898 F.2d at 1190. The Court therefore concludes that plaintiffs' right to an impartial due process hearing was not materially infringed.

### B. Non–Attendance of Teachers at IEP Committee Meeting

It is undisputed that none of Jessica's or Adam's teachers from the Michigan School for the Deaf ("MSD") attended the IEP committee meeting on May 6, 1993, at which the decision was made to return them from MSD to Central Grade School in the Traverse City Area Schools. Defendants contend they discharged their duty by inviting representatives of MSD to attend, who chose to decline.

The testimony of MSD Principal Carol Harris indicates that, indeed, she was invited to attend the IEP committee meeting. She had conducted all previous IEP committee meetings since the children had been attending MSD, but was unable to attend on May 6, 1993, because she was required to attend other prior scheduled IEP meetings. She deemed it sufficient to send reports from the children's teachers and speech therapist and did not request that the IEP committee meeting be rescheduled. She also testified she did not know a change of placement was contemplated; had she known, she would have participated.

Because the IEP committee meeting was conducted without the children's teachers' participation, plaintiffs contend the placement decision is in violation of 34 C.F.R. § 300.533(a)(3). Section 533(a)(3) requires that placement decisions be made by a group of persons "knowledgeable about the child." Plaintiffs contend the IEPs are defective because the persons most knowledgeable about Adam's and Jessica's educational needs and progress were not present.

The children's parents are obviously knowledgeable about them and were included in the group responsible for the decision. Section 533(a)(3) might, therefore, be said to have been facially satisfied. However, the parents dissented from the placement decision, as would have MSD representatives had

they been present. Thus, the decision to transfer Jessica and Adam back to Traverse City was actually made by a group of persons who had little personal familiarity with the children's recent progress and needs.

Six persons signed the IEP committee reports: the parents; Brenda Wright (interpreter for the parents); Sandy Harms Reay, hearing impaired teacher at Central Grade School; Jim Linsell, principal of Silver Lake Elementary School and District Representative; and Suzette Cooley–Sanborn, Traverse Bay Area Intermediate School District Supervisor. The three persons responsible for this decision, Ms. Reay, Mr. Linsell and Ms. Cooley–Sanborn, appear to have had little personal knowledge about Jessica's and Adam's recent progress and needs.

Granted, there are different ways to become knowledgeable about a person. Though these three persons may have had little recent personal familiarity with the children, they may have become somewhat knowledgeable through their review of the children's test results and teachers' reports and their communications with the parents. Yet, the extent of knowledge required to satisfy § 533(a)(3) must reasonably be deemed to depend on the gravity of the placement decision to be made. The decision to remove the Brimmer children from the residential institution where they have not only gone to school, but lived, five days a week for the last three years, is a weighty one, having profound impact on all aspects of their lives. The wisdom of such a decision can hardly be fairly measured without input from teachers and therapists at MSD about the progress and difficulties the Brimmers have experienced in the MSD program. It is a matter of such gravity that the Court must conclude that the IEP decisions were made by persons not sufficiently knowledgeable about the Brimmer children to satisfy § 533(a)(3) under the circumstances of this case.

This conclusion is buttressed by reference to 34 C.F.R. § 300.344:

(a) The public agency shall ensure that each [IEP] meeting includes the following participants:

. . . .

(2) the child's teacher.

Note 1, following § 344, explains that this requirement may be satisfied (a) through participation by the child's present special education teacher or, arguably, (b) through participation of a teacher qualified to provide education in the type of program in which the child may be placed. It appears Ms. Reay's participation may have technically satisfied this latter alternative. However, a fair reading of both § 344(a)(2) itself and of note 1 clearly indicates the school district was required to ensure, if possible, that Jessica's and Adam's present teachers participated in the IEP committee meeting before such a dramatic change was effected.

That the school district invited MSD representatives to attend can hardly be deemed to fulfill its duty (1) to *ensure* that the placement decision was made by a group of persons including persons knowledgeable about the child, and (2) to *ensure* that the child's teacher participated in the IEP committee meeting. There is no evidence or argument to the effect that the school district offered to reschedule the IEP committee meeting and simply could not reach an accommodation with MSD officials. Neither is there evidence that MSD officials refused to come to Traverse City at any time because of distance or inconvenience. In short, defendants have offered no reason for the Court to find that the school district substantially complied with these requirements. If these two procedural requirements, compliance with which is subject to strict review, are to have any meaning, more must be expected of the school district before such dramatically changed IEPs can be deemed to stem from proper procedure. In other words, because the instant decision does not stem from strict adherence to the applicable procedural requirements, the substantive decision is not entitled to deference, but is tainted and suspect.

The Court is not persuaded by defendants' argument that any error was cured when MSD officials were given a full opportunity to participate in the due process hearing. The nonparticipation of knowledgeable teachers at the IEP committee meeting may very

well have been determinative of the initial decision. The initial decision of the IEP committee represents the foundation for all further proceedings, reflecting the judgment of educators and parents entitled to substantial deference, and dictating who will bear the burden of proof if it is challenged. To say that the teachers' nonparticipation at the initial, potentially determinative stage was cured through later participation is too simplistic and speculative.

Accordingly, the Court concludes that the school district's failure to ensure participation of Jessica's and Adam's MSD teachers, persons knowledgeable about them, at the IEP committee meeting is a procedural defect of substance—not a mere technical deviation—which warrants remand for reformulation of the IEPs based upon correct procedure.

## C. Comprehensive Evaluation Requirement

■ Plaintiffs also object to the IEPs on the ground that they did not include updated comprehensive evaluation of the children. Under 34 C.F.R. § 104.35(a), the school district is required to conduct an evaluation of any handicapped child before initial placement and any subsequent significant change in placement. Defendants conclusorily argue that a change in placement from MSD to Traverse City is not a significant change in placement to which the comprehensive evaluation requirement attaches.

■ This argument, offered without any supporting authority, denies both the plain meaning of the regulation and the realities of this situation. "Change in placement" is not defined in the IDEA or the implementing regulations. Considering the remedial purpose of the Act, the term should be given an expansive reading. *DeLeon v. Susquehanna Community School Dist.*, 747 F.2d 149, 153 (3rd Cir.1984); *Cronin v. Bd. of Educ. of East Ramapo Central School Dist.*, 689 F.Supp. 197, 202 (S.D.N.Y.1988). Ultimately, the question whether a proposed change constitutes a change in placement, triggering procedural protections, is necessarily fact-specific. *DeLeon, supra*, 747 F.2d at 153. The focus must be on the importance of the particular modification and whether it is "likely to affect in some significant way the child's learning experience." *Id.;* see also *Sherri A.D. v. Kirby*, 975 F.2d 193, 206 (5th Cir.1992) (a change in placement occurs where there is a fundamental change in a basic element of the educational program); *Doe by Gonzales v. Maher*, 793 F.2d 1470, 1487 (9th Cir.1986), *modified on other grounds sub nom Honig v. Doe*, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988), (significant change in placement means significant change in program or services).

Applying these standards to the instant facts yields a clear result. To provide special education services in a "mainstream" program at Central Grade School in Traverse City, instead of at a residential facility some 200 miles away in Flint certainly represents a "change in placement." Further, it is a change of unquestionably great significance—geographically, educationally, socially and culturally. The record in this case reflects the ongoing philosophical debate about the values of mainstreaming, on the one hand, and segregated living on the other. The differences are substantial and their relative advantages and disadvantages vigorously controverted. This proposed change would fundamentally alter numerous elements of the Brimmer children's educational programs and would undeniably affect their learning experience in profound ways. This decision clearly represents a significant change in placement. *Cf., Tilton by Richards v. Jefferson County Bd. of Educ.*, 705 F.2d 800, 804 (6th Cir.1983), *cert. denied*, 465 U.S. 1006, 104 S.Ct. 998, 79 L.Ed.2d 231 (1984) (transfer from 12–month day treatment program to 180–day alternative school program in same district constitutes a change in placement); *Concerned Parents v. New York City Bd. of Educ.*, 629 F.2d 751, 754 (2d Cir.1980), *cert. denied*, 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981), (transfer from special class in regular school to special school is a fundamental alteration constituting a change in placement); *Weil v. Bd. of Elementary & Secondary Educ.*, 931 F.2d 1069, 1072 (5th Cir.1991) (transfer from one school to another in same school district, where both schools provided substantially

similar classes and implemented same IEP, not a change in placement); *Lamont X v. Quisenberry,* 606 F.Supp. 809, 814 (S.D.Ohio 1984) (transfer from classroom to home-based tutoring is a change in placement).

As a significant change in placement, each of the Brimmer children's IEPs is required under 34 C.F.R. § 104.35(a) to include a placement evaluation in conformity with § 104.35(b).[1] Additional guidance as to the contents of this evaluation is found at 34 C.F.R. § 300.532, describing placement evaluation procedures.[2] An evaluation meeting the requirements of § 300.532 must be conducted "every three years, or more frequently if conditions warrant." 34 C.F.R. § 300.534. The most recent comprehensive evaluations of the Brimmer children were conducted in June 1991. New evaluations would have been due this past summer in any event. Yet, based on the foregoing analysis, it is clear that "conditions warranted" re-evaluation in May 1993, when these initial change in placement decisions were made by the IEP committee.

Defendants have not demonstrated or even argued that the comprehensive evaluation requirements of § 104.35(b) and § 300.532 were met or substantially complied with in this case. The instant placement decisions were not premised upon consideration of updated comprehensive evaluation results. Thus, evaluation results that would have reflected the children's progress and needs since they had begun attending MSD—information integral to the placement decisions at hand—were not available or considered. Again, this is a significant procedural defect, not a mere technical deviation. It can be cured only by requiring the school district to reformulate the IEPs.

## D. Conclusion

Based on the foregoing, the Court concludes that plaintiffs have shown by a pre-

---

1. Section 104.35(b) provides:

    (b) *Evaluation procedures.* A recipient to which this subpart applies shall establish standards and procedures for the evaluation and placement of persons who, because of handicap, need or are believed to need special education or related services which ensure that:

    (1) Tests and other evaluation materials have been validated for the specific purpose for which they are used and are administered by trained personnel in conformance with the instructions provided by their producer;

    (2) Tests and other evaluation materials include those tailored to assess specific areas of educational need and not merely those which are designed to provide a single general intelligence quotient; and

    (3) Tests are selected and administered so as best to ensure that, when a test is administered to a student with impaired sensory, manual or speaking skills, the test results accurately reflect the student's aptitude or achievement level or whatever other factor the test purports to measure, rather than reflecting the student's impaired sensory, manual, or speaking skills (except where those skills are the factors that the test purports to measure).

2. Section 300.532 provides:

    State educational agencies and LEAs [local educational agencies] shall ensure, at a minimum, that:

    (a) Tests and other evaluation materials—

    (1) Are provided and administered in the child's native language or other mode of communication, unless it is clearly not feasible to do so;

    (2) Have been validated for the specific purpose for which they are used; and

    (3) Are administered by trained personnel in conformance with the instructions provided by their producer.

    (b) Tests and other evaluation materials include those tailored to assess specific areas of educational need and not merely those that are designed to provide a single general intelligence quotient.

    (c) Tests are selected and administered so as best to ensure that when a test is administered to a child with impaired sensory, manual, or speaking skills, the test results accurately reflect the child's aptitude or achievement level or whatever other factors the test purports to measure, rather than reflecting the child's impaired sensory, manual, or speaking skills (except where those skills are the factors that the test purports to measure).

    (d) No single procedure is used as the sole criterion for determining an appropriate educational program for a child.

    (e) The evaluation is made by a multidisciplinary team or group of persons, including at least one teacher or other specialist with knowledge in the area of suspected disability.

    (f) The child is assessed in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities.

ponderance of the evidence that the IEPs are the product of defective procedure. The defects are significant, necessitating remand to the school district so that new IEPs can be formulated in conformity with all applicable procedural requirements and including, in particular, (1) IEP committee meeting participation by Jessica's and Adam's MSD teachers and (2) consideration of updated comprehensive placement evaluation results. Until the IEPs are reformulated, the Brimmer children shall remain in their current placement in the Michigan School for the Deaf.

## III. SUBSTANTIVE ISSUES

■ The above disposition of plaintiffs' procedural objections renders moot their challenge to the substantive decision. Inasmuch as the entire matter is being returned to the school district for reformulation of the IEPs, however, a few words of instruction on relevant substantive issues are appropriate. The Court expresses no opinion on the merits of the decision to change the educational placement of Jessica and Adam Brimmer. The Court's comments are motivated by two observations. First, the hearing officers' decisions contain little discussion of the abilities, needs and "maximum potential" of each of the children. Second, the hearing officers' decisions do not contain a comparative "least restrictive environment" analysis of the two educational settings in light of the children's abilities and needs.

The IDEA requires that states receiving federal funds provide a "free appropriate public education" to all handicapped children within their jurisdiction. The Act itself does not require states to maximize the potential of handicapped children, but provides a "basic floor of opportunity consisting of access to specialized institutions and related services which are individually designed to provide educational benefits to the handicapped child." *Tullahoma City Schools, supra,* 9 F.3d at 459, quoting *Bd. of Educ. v. Rowley,* 458 U.S. 176, 201, 102 S.Ct. 3034, 3048, 73 L.Ed.2d 690 (1982).

Michigan's special education scheme requires more, however. It requires that special education programs and services be designed to "develop the maximum potential of

each handicapped person." M.C.L. §§ 380.1701(a), 380.1711(1)(a), 380.1751(1). This standard is incorporated into the IDEA definition of "free appropriate public education" at 20 U.S.C. § 1401(18):

> The term "free appropriate public education" means special education and related services that—
>
> . . . .
>
> (B) meet the standards of the State education agency, . . . .

See also *Town of Burlington v. Dep't of Educ., Commonwealth of Mass.,* 736 F.2d 773, 784 (1st Cir.1984), *aff'd* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *Barwacz v. Michigan Dep't of Educ.,* 681 F.Supp. 427, 433 (W.D.Mich.1988).

The term "maximum potential" has not been well defined in Michigan law. Further, the standard may be more precatory than mandatory; it does not necessarily require the best education possible. *Id.,* at 436. Yet, it clearly suggests that something more than the federal "basic floor of opportunity" standard is required to satisfy Michigan law. See *Barwacz v. Michigan Dep't of Educ.,* 674 F.Supp. 1296, 1305 (W.D.Mich.1987).

Here, Local Hearing Officer Wawrzaszek did not even consider the "maximum potential" standard. When he concluded that both the Traverse City and MSD programs would provide a basic floor of opportunity, he proceeded directly to evaluate the "least restrictive environment" criterion, without considering how each program would serve to develop the maximum potential of each child. The reviewing state level hearing officer, Russell J. Sansbury, Ph.D., did not totally ignore the maximum potential standard. He refrained from applying it, however, because he found it has not been defined in a manner that enables objective measurement of a program's ability to develop a child's potential.

The Court acknowledges the difficulty of applying a statutory standard that lacks concrete definition. Yet, the difficulty of the task does not excuse its nonperformance. The Michigan Legislature has clearly stated that the maximum potential of each handicapped person shall be considered in designing and providing special education programs

and services. In all probability, the Legislature left the standard undefined so that educators and other experts in the field would have broad discretion in applying it to the unique facts and circumstances in each case. It appears the decisionmakers in this case too cavalierly avoided their responsibility to evaluate how each program would serve to develop the maximum potential of each of the Brimmer children.

The hearing officers' treatment of the "least restrictive environment" requirement is also questionable for its superficiality. The IDEA requires states to ensure that handicapped children are educated "to the maximum extent appropriate" with children who are not handicapped. 20 U.S.C. § 1412(5)(B). The Sixth Circuit's approach to this "mainstreaming" preference is described as follows:

> In *Roncker on Behalf of Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir.1983), this Circuit set out its interpretation of the mainstreaming requirement of the federal Act:
>
> > The Act does not require mainstreaming in every case but its requirement that mainstreaming be provided to the *maximum* extent appropriate indicates a very strong congressional preference. The proper inquiry is whether a proposed placement is appropriate under the Act.
>
> However, this Court recognizes that even though the preference for mainstreaming is very strong there are still situations in which,
>
> > some handicapped children simply must be educated in segregated facilities either because the handicapped child would not benefit from mainstreaming, because any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not feasibly be provided in the non-segregated setting, or because the handicapped child is a disruptive force in the non-segregated setting.
>
> *Id.,* at 1063.

*Tullahoma City Schools, supra,* 9 F.3d at 460. This preference exists in the Michigan special education scheme as well.

Here, again, both hearing officers, having once found that both educational settings would provide a free appropriate public education, rather summarily concluded that MSD is clearly the more restrictive environment. MSD is a segregated residential facility and does not allow for as much instructional and extra-curricular activity with non-hearing impaired students. It does not necessarily follow, however, that Central Grade School in Traverse City is "appropriate" as the least restrictive environment. If the benefits that Jessica and Adam would receive from mainstreaming would be marginal and far outweighed by the benefits available in a segregated facility, then Central Grade School, albeit providing a basic floor of opportunity, would not be the appropriate placement, congressional preference notwithstanding. *Id.* In other words, even as between a segregated community and a regular classroom setting, the segregated community can be deemed the least restrictive environment. *Barwacz, supra,* 681 F.Supp. at 436. That the hearing officers in this case did not undertake this comparative analysis of the benefits that the children would receive in each program is a conspicuous shortcoming.

This conclusion is buttressed by the Policy Guidance statement issued by Education Secretary Lamar Alexander and published in the Federal Register on November 4, 1992. The policy statement arises out of recognition that hearing-impaired children have unique communication needs that are not being adequately considered in their IEPs:

> The Secretary is concerned that some public agencies have misapplied the LRE provision by presuming that placements in or closer to the regular classroom are required for children who are deaf, without taking into consideration the range of communication and related needs that must be addressed in order to provide appropriate services.
>
> . . . .
>
> Any setting, including a regular classroom, that prevents a child who is deaf from receiving an appropriate education that meets his or her needs, including communication needs, is not the LRE for that individual child.

For some children who are deaf, the Secretary observed, "a center or special school may be the least restrictive environment in which the child's unique needs can be met." The Secretary emphasized that placement decisions "must be made only after a full and complete IEP has been developed that addresses the full range of the child's needs." According to the statement, the following factors are to be considered in formulating an IEP for a child who is deaf:

1. Communication needs and the child's and family's preferred mode of communication;

2. Linguistic needs;

3. Severity of hearing loss and potential for using residual hearing;

4. Academic level; and

5. Social, emotional, and cultural needs, including opportunities for peer interactions and communication.

Again, implementation of the congressional preference for mainstreaming is deemed to entail more than merely determining that both a regular classroom setting and a segregated facility will provide a basic floor of opportunity and then choosing the regular classroom as the least restrictive environment.

■ Local Hearing Officer Wawrzaszek took notice of the Secretary's policy statement, but held it does "not carry the weight of law and should be treated accordingly." While the policy statement may not have the force of law, the interpretation given a statute by the agency charged with administering it is certainly entitled to substantial deference. See e.g., *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984) (agency's interpretation of its own statute controlling unless contrary to congressional intent). The hearing officer appears not to have given the policy statement its due respect. Further, in addressing the five factors identified by the Secretary, he found simply that the parents had failed to show how their children's communication, linguistic, cultural, social and emotional needs are "peculiar" in comparison with other deaf students.

This finding reflects the superficiality of consideration given to the Brimmer Children's unique needs. It also highlights one of the procedural defects discussed above: the lack of comprehensive evaluation results. The factors identified by the Secretary are to be considered and evaluated initially by a multidisciplinary team in the development of the IEP. Because no such comprehensive evaluation was performed and considered as part of the IEP committee reports, the IEPs were the product of defective procedure, the parents were handicapped in their ability to demonstrate their children's unique needs, and the decisionmakers throughout the process were ill-equipped to determine how each program might help to develop each child's maximum potential in the least restrictive environment.

Correction of the procedural defects on remand ought to materially improve the IEPs, primarily by making more information available to the IEP committee in the form of comprehensive evaluation results and through participation of the children's teachers. If this additional information is evaluated in light of the substantive framework just summarized, with explicit consideration of the Brimmer children's unique abilities and needs, the placement decision ultimately made ought to be more plainly justified.

A judgment order consistent with this opinion setting aside defendant's change of placement decision and requiring the Brimmer children to remain in their current placement at MSD until their IEPs can be reformulated in accordance with the Court's analysis and instruction, shall issue forthwith.