**Steve DAUGHERTY, Jr., By and Through his parent and conservator, Steve DAUGHERTY, Sr., Plaintiff,**

**v.**

**HAMILTON COUNTY SCHOOLS, Defendant.**

No. 1:96–CV–122.

United States District Court, E.D. Tennessee.

June 16, 1998.

Gary D. Buchanan, Tennessee Protection & Advocacy, Inc., Nashville, TN, for plaintiff.

Gary D. Lander, Chambliss, Bahner & Stophel, PC, Chattanooga, TN, for defendant.

## MEMORANDUM

COLLIER, District Judge.

Before the Court is the Motion for Summary Judgment filed by Defendant Hamilton County Department of Education ("HCDE") (Court File No. 18).[1] Plaintiff Steve Daugherty, Jr. ("Daugherty") filed a Brief in Support of Reversal and Remand (Court File

---

1. Although the style of the case lists the Defendant as "Hamilton County Schools," the Defendant's proper name is "Hamilton County Department of Education" (*see* Court File No. 18). Throughout the Memorandum, the Court will refer to the Defendant as "HCDE."

No. 17)[2] and a Response to the summary judgment motion (Court File No. 22). HCDE filed a Reply (Court File Nos. 23 and 24). For the following reasons, the Court will GRANT the motion for summary judgment filed by HCDE (Court File No. 18) and will DENY the motion filed by Daugherty (Court File No. 17).

## I. PERTINENT FACTS

### A. The Proceedings Below

Daugherty appeals an order entered by an administrative law judge ("ALJ") appointed by the Tennessee Department of Education to hold a "due process hearing" brought under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.A. §§ 1400—1491o (1990 and Supp.1997); see id. § 1415(b)(1) and (2). The ALJ framed the issues as "(1) Did the School System violate the procedural requirements of IDEA? [and] (2) What effect has the Student's graduation from Grove School had upon his eligibility for services?" (Court File No. 16, A.R. 504).[3] Specifically, the ALJ's order identified two alleged procedural errors: (1) inadequate notice to Daugherty's father[4] of a meeting that resulted in Daugherty's graduation from Grove School, and (2) the absence of certain Grove School personnel at the same meeting; and characterized the graduation claim as whether Daugherty should have been given post-secondary education at HCDE's expense (see id. at A.R. 505–07); (see also Court File No. 17, pp. 6–7).

The ALJ granted HCDE's motion for summary judgment (Court File No. 16, A.R. 508). The ALJ found the facts indicated Daugherty had sufficient notice he was scheduled to graduate in August 1995, he did in fact graduate without invoking the "stay put" provision of IDEA, and he suffered from mental and emotional problems distinct from his educational inabilities (id. at A.R. 504–05). As for the June 28, 1995 meeting, about which Daugherty contends he had insufficient notice, the ALJ noted undisputed affidavits established Daugherty's father actually called the meeting (id. at A.R. 505). In response to Daugherty's contentions, the ALJ pointedly requested Daugherty file affidavits detailing the harm caused by HCDE's alleged procedural violations; Daugherty filed nothing (id.). The ALJ concluded the evidence before him indicated Daugherty's medical condition, rather than the alleged procedural violations, was the root of his continued difficulties (id.).

The ALJ also found the facts uncontradicted as to the graduation claim. Daugherty argued he did not receive "educational benefits" from Grove School. Essentially, Daugherty asserted he did not meet his social-emotional goals and goals related to vocational training and daily living skills, which had been established under IDEA guidelines. As evidence of this assertion, Daugherty proffered the testimony of a Grove School psychologist who acknowledged Daugherty's successful completion of the Grove School's academic criteria but recommended he remain in a structured environment (id. at A.R. 506). The ALJ, though, commented the "undisputed proof [demonstrated Daugherty] completed the requirements for a diploma from the State of Connecticut, having met all of the requirements for said diploma at the Grove School" (id. at A.R. 505). Citing controlling case authority, the ALJ concluded "[a] school system is not required to guarantee that the Student will be self sufficient once he completes his course of study" nor to provide post-graduate services (id. at A.R. 506–07).[5]

---

2. Though not specifically argued or termed as such, the Court will consider Daugherty's motion as one for summary judgment.

3. The Administrative Record ("A.R.") is located within the Court's file as documents Nos. 15 and 16.

4. The only parent Daugherty refers to is his father. Though not influential to the Court's decision, HCDE points out an apparent disagreement between Daugherty's father and his stepmother regarding Daugherty's return home after his graduation from the Grove School (see Court File No. 23, pp. 12–13).

5. The ALJ's order also addressed an alleged failure to provide "transition services" (Court File No. 16, A.R. 507). Daugherty does not argue this issue before the Court (see Court File No. 10, pp. 2–3; Court File No. 17, pp. 6–7; Court File No. 19, pp. 9, 17). Although the Court will accordingly not review the ALJ's decision pertaining to transition services, the Court notes

### B. *Steve Daugherty, Jr.'s Contentions*

Realizing Daugherty's inability to function in a typical educational setting, HCDE paid for his education from May 1992 through August 1995, during which time he qualified as a disabled child under the IDEA. Daugherty attended the Grove School in Madison, Connecticut, a private residential school for students with serious emotional disturbance. In August 1995, the Grove School graduated Daugherty upon his successful completion of the school's academic requirements. He was twenty (20) years old at the time.

Daugherty first argues inadequate notice of the June 28, 1995 meeting "could have prevented [his] father from 'effectively participating'" in the process by which HCDE affects his "free appropriate public education" ("FAPE") under IDEA (Court File No. 17, p. 11). The record clearly shows Daugherty's father both called for and attended the meeting. The record also shows Daugherty's father knew well in advance HCDE's and the Grove School's intention to graduate Daugherty in 1995. He also contends the June 28, 1995 meeting violated IDEA because his "teacher" was not present and persons "knowledgeable about the child" did not participate in the decision to graduate him or to deny him post-secondary school residential services.

Other than simply calling for and attending the meeting, Daugherty's father did not request any particular teacher from the Grove School to be present. Present, though, at the meeting were Dr. Walter Ruby, a school psychologist, Danny Gaddy, a teacher qualified in counseling who had dealt with Daugherty on an one-on-one basis, and Kathy Crocker Brown, a supervisor with personal knowledge of Daugherty and his program (Court File No. 23, p. 7). HCDE avers the June 28, 1995 meeting received and reviewed materials from the Grove School, a neuropsychological evaluation performed by Dr. Lynn Cattanach ("Cattanach") in February and March 1994, and the evaluation of Donna B. Palmer, school psychologist with the HCDE Department of Exceptional Education.

Daugherty claims the August 1995 graduation deprived him of educational benefits to which he had a right under the IDEA. He summarizes this claim as follows:

> [T]he fact that [Daugherty] has received a diploma from Grove School is not dispositive ... The [Individualized Educational Program ("IEP")] must be completed before graduation is appropriate under [IDEA] ... [Daugherty] did not complete his IEP; his graduation from Grove was based on satisfaction of academic requirements only. In view of [his] profound needs in other areas, mere completion of academic requirements cannot be considered educational benefit.

(Court File No. 17, p. 14). Daugherty asserts the IEP prepared for him in February 1995 detailed the "profound needs in other areas," stating:

> [Daugherty] needs to continue to develop healthy coping skills, to improve his peer relationships, and to actively pursue vocational skills and to improve his motivation and skills at his on campus job. He is not prepared for off campus/community employment and needs to enter a life skills and vocational training program after his graduation from Grove in Summer, 1995.

(*id.* at p. 4).

As evidence, Daugherty cites Cattanach's neuropsychological evaluation performed in February and March 1994. Cattanach's report observed:

> The pattern of results from this evaluation indicates that [Daugherty] is a seriously limited young man, *both intellectually and psychologically* ... He is functioning at a borderline intellectual level, with impairments in motor, sensory, language, learning, and memory functioning. In terms of personality functioning, [he] is anxious and depressed at present. *He is also at risk for psychotic responding and severely compromised functioning if environmental demands exceed his coping resources* ... The implications of the results are that [Daugherty] is not equipped to live independently, achieve his aspirations, or

HCDE emphasized that the ALJ found Daugherty did not rebut HCDE's proof on this issue and that Daugherty dropped the issue (Court File No. 19, pp. 3, 9, 17).

secure employment. *He requires an ongoing sheltered living arrangement, psychotherapy, support and structure, and special services to identify vocational directions and train him for employment.* (*id.* at pp. 2–3) (emphasis added). The participants in the June 28, 1995 meeting reviewed and considered Cattanach's report (Court File No. 23, p. 9). Daugherty also submitted evidence from a Grove School psychologist, Dr. Doug Sue, who commented:

It has taken [Daugherty] months to understand that he needs vocational training and he has not shown any commitment in any motivated, consistent way, to pursue that training. *Instead, he continues to need psychological support, and direction from authority figures.* Even in terms of his activities of daily living, he is not self-sufficient. He needs training in that area, needs constant prompting and consequences for his behavior ... At this point, it is strongly felt that this young man requires a structured placement. *Left to his own devices, it is unlikely that he could subsist in the outside world with his current low level of social skills, his inability to look out for his own best interest, and his lack of vocational skills.*

(Court File No. 17, p. 6) (emphasis added).

Daugherty argues "[b]ut for the termination of his eligibility by [HCDE], he would have been entitled to special education and related services from [HCDE] through the date of his twenty-second birthday" (*id.* at p. 5). HCDE contends Daugherty's argument "may be boiled down to the proposition that he has not 'aged-out' from eligibility and therefore must continue to be served in ... residential placement ... [Daugherty asks] the Court to endorse the novel proposition that since certain non-educational goals of the Grove IEPs, including independent living, social and emotional growth[,] and vocational needs were not maximized or completed, he is ... entitled to an additional year or two of restrictive residential placement" (Court File No. 23, pp. 9–10).

## II. *STANDARD OF REVIEW*

Under *Fed.R.Civ.P.* 56, the Court will render summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to show conclusively no genuine issue of material fact exists, *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir.1994); *Kentucky Div., Horsemen's Benev. & Prot. Assoc., Inc. v. Turfway Park Racing Assoc., Inc.,* 20 F.3d 1406, 1411 (6th Cir.1994), and the Court must view the facts and all inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Oakland Gin Co., Inc. v. Marlow,* 44 F.3d 426, 429 (6th Cir.1995); *City Management Corp. v. U.S. Chemical Co., Inc.,* 43 F.3d 244, 250 (6th Cir.1994).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Lansing Dairy,* 39 F.3d at 1347; *Horsemen's Benev.,* 20 F.3d at 1411; *see also Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 404–06 (6th Cir.1992) (holding courts do not have the responsibility to search *sua sponte* the record for genuine issues of material fact). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435–36 (6th Cir.1987). The standard for summary judgment mirrors the standard for directed verdict. The Court must decide "whether the evidence presents a sufficient disagreement to require submis-

sion to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the Court concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.; Lansing Dairy,* 39 F.3d at 1347; *Horsemen's Benev.,* 20 F.3d at 1411.

■ The standard of review for actions brought under the IDEA is a modified *de novo* review. *See* 20 U.S.C.A. § 1415(e)(2). In *Board of Education v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the United States Supreme Court indicated that a complete *de novo* review is inappropriate. The United States Court of Appeals for the Sixth Circuit reasoned the language in the IDEA "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review...." *Thomas v. Cincinnati Board of Educ.,* 918 F.2d 618, 624 (6th Cir.1990) (quoting *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034). The Sixth Circuit determined *Rowley* "requires a *de novo* review [of the due process hearing] but that the district court should give due weight to the state administrative proceedings in reaching its decision." *Roncker on Behalf of Roncker v. Walter,* 700 F.2d 1058, 1062 (6th Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983); *see also Doe v. Board of Educ. of Tullahoma City Schools,* 9 F.3d 455, 458 (6th Cir.), *cert. denied,* 511 U.S. 1108, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994).

■ In this case, neither party requested the opportunity to present additional evidence (Court File No. 11, ¶ 3); *see also* 20 U.S.C.A. § 1415(e)(2) (noting a reviewing court "shall hear additional evidence at the request of a party"). This entitles the Court "to assume that the parties want the case decided on the basis of the administrative record." *Hunger v. Leininger,* 15 F.3d 664, 669 (7th Cir.1994). Daugherty bears the burden of proving by a preponderance of the evidence that HCDE violated the IDEA.

*Tullahoma City Schools,* 9 F.3d at 458; *Cordrey v. Euckert,* 917 F.2d 1460, 1469 (6th Cir.1990), *cert. denied,* 499 U.S. 938, 111 S.Ct. 1391, 113 L.Ed.2d 447 (1991); *Doe v. Defendant I,* 898 F.2d 1186, 1191 (6th Cir. 1990).

## III. DISCUSSION

Under the IDEA, a student who is eligible for special education because of a disability is entitled to a "free appropriate public education" ("FAPE"), consisting of special education and related services. The IDEA defines a FAPE as:

> [S]pecial education and related services that—
>
> (A) have been provided at public expense, under public supervision and direction, and without charge,
>
> (B) meet the standards of the State educational agency,
>
> (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and
>
> (D) are provided in conformity with the individualized education program [("IEP")] required under section 1414(a)(5) of this title.

20 U.S.C.A. § 1401(a)(18). "Special education" means

> specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a child with a disability, including—
>
> (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and
>
> (B) instruction in physical education.

*Id.* § 1401(a)(16). "Related services" means, in pertinent part,

> transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, and medical services, except that such medical services shall be for diagnostic and evaluation purposes

only) as may be required to assist a child with a disability to benefit from special education....

*Id.* § 1401(a)(17).

An "M–Team" is a group of individuals, including educators and medical professionals with knowledge of a child's condition, who are required to develop an IEP for every disabled child, specifying the necessary special education and related services, which the child needs in order to receive a FAPE. *See, generally,* 34 C.F.R. §§ 300.340–350. The IDEA defines an IEP as:

a written statement for each child with a disability developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities, the teacher, the parents or guardian of each child, and, whenever appropriate, such child, which statement shall include—

(A) a statement of the present levels of educational performance of such child,

(B) a statement of annual goals, including short-term instructional objectives,

(C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs,

(D) a statement of the needed transitional services for students beginning no later than age 16 and annually thereafter (and, when determined appropriate for the individual, beginning at age 14 or younger), including, when appropriate, a statement of the interagency responsibilities or linkages (or both) before the student leaves the school setting,

(E) the projected date for initiation and anticipated duration of such services, and

(F) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

In the case where a participating agency, other than the educational agency, fails to provide agreed upon services, the educational agency shall reconvene the IEP team to identify alternative strategies to meet the transition objectives.

20 U.S.C.A. § 1401(a)(20). Once an IEP has been developed for a disabled child, the state educational agency must provide the special education and related services necessary to implement the IEP and to provide a FAPE to the disabled child at no cost to the child's parents. *See* 34 C.F.R. § 300.401; *see also Tennessee Dept. of Mental Health v. Paul B.,* 88 F.3d 1466, 1471 (6th Cir.1996) (noting "the development and implementation of the IEP are the cornerstones" of the IDEA).

The IDEA creates a statutory preference and expressly mandates disabled children be educated in the least restrictive environment to the maximum extent appropriate. *See* 20 U.S.C.A. § 1412(5)(B); 34 C.F.R. §§ 300.550–556. Notwithstanding the IDEA's mandate students be placed in the least restrictive environment, the IDEA provides for residential placement if such a placement is necessary to meet the child's individual educational needs. *See* 20 U.S.C.A. §§ 1401(a)(16)(A) and 1413(a)(4)(B); 34 C.F.R. §§ 300.302 and 300.551.

The controlling regulation provides:

If placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child.

34 C.F.R. § 300.302. "To assess whether a residential placement is appropriate, a determination must be made whether full time residential placement is necessary for educational purposes as opposed to medical, social, or emotional problems that are separable from the learning process." *Paul B.,* 88 F.3d at 1471; *see also McKenzie v. Smith,* 771 F.2d 1527, 1534 (D.C.Cir.1985); *Kruelle v. New Castle County School Dist.,* 642 F.2d 687, 693 (3rd Cir.1981). Under the IDEA, residential placement is "at no cost to the parents of the child" only if it is necessary for educational purposes. *Paul B.,* 88 F.3d at 1471.

## A. *Procedural Violations*

■ Neither party questions the importance of the procedural safeguards established under the IDEA:

It is beyond dispute that *full parental involvement in the handicapped child's education* is the purpose of many of the [IDEA's] procedural requirements, and *a procedural violation causing harm warrants equitable relief.*

*Paul B.,* 88 F.3d at 1478 (emphasis added) (citation and quotation omitted); *see also Thomas,* 918 F.2d at 625 (noting the child's parent "did participate in the conference which is, after all, the notice requirement's purpose"); *Cordrey,* 917 F.2d at 1467 (noting "the parents of a handicapped child [must] have full opportunity to participate"). Without substantive harm, though, the procedural violation does not cause liability to attach. *See Paul B.,* 88 F.3d at 1478; *Thomas,* 918 F.2d at 625; *Cordrey,* 917 F.2d at 1467.

■ Daugherty's claim of inadequate notice rings hollow in light of case authority and the facts. *See* 34 C.F.R. §§ 300.504 and 300.505 (addressing notice). Indeed, Daugherty's father both called for and attended the June 28, 1995 meeting about which he argues HCDE violated the notice provisions. The record further indicates Daugherty's father has actively and knowingly participated in every aspect of the IEP throughout Daugherty's stay at the Grove School. Beyond simply alleging HCDE violated the technical requirements of the regulations, Daugherty offers nothing more than his speculation that inadequate notice "*could have prevented* [his] father from 'effectively participating' " (Court File No. 17, p. 11) (emphasis added). Without more, the Court concludes such generalized, speculation fails to constitute sufficient evidence of harm such that it warrants liability under the IDEA.

■ Daugherty's claim about the absence from the June 28, 1995 meeting of his teacher implicates two regulations. First, Daugherty argues 34 C.F.R. § 300.344(a)(2): "The public agency shall ensure that each meeting includes the following participants: ... (2) The child's teacher." However, the regulation premises this requirement upon the particular "meeting" involved, which is any "meeting[ ] for the purpose of developing, reviewing, and revising [an] IEP." 34 C.F.R. § 300.343(a). The record before the Court indicates the June 28, 1995 meeting did not pertain to developing, reviewing, or revising Daugherty's IEP. Second, HCDE emphasizes 34 C .F.R. § 300.533, which reads, in pertinent part:

(a) In interpreting evaluation data and *in making placement decisions,* each public agency shall——

(1) Draw upon information from a variety of sources, including aptitude and achievement tests, teacher recommendations, physical condition, social or cultural background, and adaptive behavior;

(2) Ensure that information obtained from all of these sources is documented and carefully considered;

(3) Ensure that the placement decision *is made by a group of persons, including persons knowledgeable about the child,* the meaning of the evaluation data, and the placement options....

34 C.F.R. § 300.533(a)(1), (2), and (3) (emphasis added).

Daugherty relies on *W.G. v. Board of Trustees of Target Range School Dist.,* 960 F.2d 1479 (9th Cir.1992), and *Brimmer v. Traverse City Area Public Schools,* 872 F.Supp. 447 (W.D.Mich.1994). Both cases are distinguishable. In *W.G.,* the school district "independently developed the IEP" *before* the scheduled IEP meeting without input and participation from the student's parents, the student's regular classroom teacher, or any representative from the private school where the student attended. *W.G.,* 960 F.2d at 1484. In *Brimmer,* none of the students' teachers attended the IEP meeting and the people who did attend "had little personal knowledge" about the students. *See Brimmer,* 872 F.Supp. at 450, 451. The court cautioned against making decisions affecting a disabled child when "teachers and therapists" familiar with "the progress and difficulties" of the students do not participate in the decision. *Id.* at 451.

Such is not the case here. Attending the June 28, 1995 meeting were Daugherty's father, Dr. Walter Ruby, a school psychologist,

Danny Gaddy, a teacher qualified in counseling who had dealt with Daugherty on an one-on-one basis, and Kathy Crocker Brown, a supervisor with personal knowledge of Daugherty and his program (Court File No. 23, p. 7). In addition, those attending received and reviewed materials from the Grove School, Cattanach's neuropsychological evaluation completed in February and March 1994, and the evaluation of Donna B. Palmer, school psychologist with the HCDE Department of Exceptional Education. Daugherty has not contested the qualifications of these people or their knowledge about him and his IEP.

It is significant Daugherty's father called the meeting and did not request any particular "teacher" to attend. Nor can Daugherty dispute his father's knowledge of HCDE's and the Grove School's intent to graduate him later in 1995. The ALJ's approach to this claim is key. The ALJ specifically requested Daugherty to identify some harm caused by this alleged procedural violation; Daugherty did not proffer anything to the ALJ. In light of the presence of persons knowledgeable about Daugherty at the June 28, 1995 meeting and the nature of the meeting, the Court finds this alleged procedural violation, too, fails to warrant liability under the IDEA.

**B.** *Educational Benefits*

■ While the Supreme Court noted states are not required to "maximize the potential of handicapped children," *Rowley*, 458 U.S. at 189, 102 S.Ct. 3034; *Thomas*, 918 F.2d at 626, the Sixth Circuit concluded the educational benefits the state does give must be more than *de minimis* in order to be "appropriate." *Tullahoma City Schools*, 9 F.3d at 459; *Doe By and Through Doe v. Smith*, 879 F.2d 1340, 1341 (6th Cir.1989). The IDEA provides no more than a "basic floor of opportunity ... consist[ing] of access to specialized institutions and related services which are individually designed to provide educational benefit to the handicapped child." *Tullahoma City Schools*, 9 F.3d at 459 (quoting *Rowley*, 458 U .S. at 201, 102 S.Ct. 3034); *see also Doe*, 879 F.2d at 1341. "The standard is satisfied by 'providing per-

sonalized instruction with sufficient support services *to permit the child to benefit educationally* from that instruction.'" *Doe*, 879 F.2d at 1341 (emphasis added); *see also Thomas*, 918 F.2d at 620 n. 5 (quoting *Doe*, 879 F.2d at 1341).

At issue is whether Daugherty received educational benefits from his IEP or whether HCDE is fiscally responsible under the IDEA for at least one additional year beyond Daugherty's successful completion of the Grove School's academic requirements. *See Rowley*, 458 U.S. at 207, 102 S.Ct. 3034 (asking whether the IEP is "reasonably calculated to enable the child to receive educational benefits"); *Thomas*, 918 F.2d at 626 (quoting *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034). Characterizing Daugherty's claim for inadequate educational benefits is important. Daugherty alludes to, but does not sufficiently contest, his graduation from the Grove School (*see* Court File No. 17, p. 14); rather, the record indicates his graduation evinces his successful completion of the school's academic requirements.

■ The Court's starting point is the ALJ's determination Daugherty's medical condition was the root of his post-graduation difficulties. Against this conclusion, Daugherty offers no specific rebuttal. Essentially, the Court understands Daugherty contends he has not received educational benefits because he cannot function in daily life outside of a structured, supervised environment. HCDE contends Daugherty is seeking subsidization of psychiatric, social, and emotional services distinct from any educational program required by the IDEA. HCDE argues Daugherty's request for an additional year or two of post-secondary placement is thus analogous to cases in which students seeks psychiatric hospitalization. *See Tice v. Botetourt County School Board*, 908 F.2d 1200 (4th Cir.1990); *Clovis Unified School Dist. v. California Office of Administrative Hearings*, 903 F.2d 635 (9th Cir.1990).

*Clovis Unified* is instructional. In *Clovis Unified*, the court declined to mandate state payment of services merely "supportive of a handicapped child's education ... [as] far too inclusive." *Clovis Unified*, 903 F.2d at 643 (noting ear surgery to improve one's hearing

or kidney dialysis, though both important to the child and ultimately beneficial to an education, are not the responsibility of the school district). The court also refused to saddle a state with the entire cost of a placement based upon intertwined medical and educational problems. *See id.* Instead, the "analysis must focus on whether [the] placement may be considered necessary for educational purposes, or whether the placement is a response to medical, social, or emotional problems that is necessary quite apart from the learning process." *Id.* Under such an analysis, the court found the psychiatric hospitalization provided not to be the financial responsibility of the school district. *See id.* at 645–47; *see also Tice,* 908 F.2d at 1209 (following *Clovis Unified* and noting "expenses incurred during the hospitalization ... for educational services ... are subject to reimbursement").

This reasoning is consistent with the definition of "related services." Related services are "supportive services ... including ... psychological services ... and medical services, except that such medical services shall be for diagnostic and evaluation purposes only[,] ... *as may be required to assist a child with a disability to benefit from special education.*" 20 U.S.C.A. § 1401(a)(17) (emphasis added). Related services are therefore provided contemporaneously with and as an aid to a disabled child's receipt of a FAPE.

It is important to remember the IDEA does not require maximization of the educational experience. Both *Clovis Unified* and the definition of related services counsel the Court to focus on the degree to which the requested services benefit a disabled child's education. While an education may include more than simply progressing from one academic grade to another, Daugherty, as previously noted, failed to adequately contest the fact of his graduation from secondary school. That the particular services Daugherty seeks extend beyond his successful completion of a secondary school education is thus significant. *See id.* § 1401(a)(18) (noting a FAPE includes "preschool, elementary, or secondary school education"); *see also Chuhran v.*

*Walled Lake Consolidated Schools,* 839 F.Supp. 465, 473–74 (E.D.Mich.1993) (noting the successful completion of general graduation requirements in light of a student's IEP normally constitutes an adequate FAPE and forecloses further special educational services under IDEA), *aff'd,* 51 F.3d 271, 1995 WL 138882 (6th Cir.1995).

■ The Sixth Circuit's reasoning pertaining to the provision of an "extended school year" ("ESY") offers guidance on this point.[6] In *Cordrey,* the Sixth Circuit stated:

*[t]he best rule is that which recognizes that the school district has no purely custodial duty to provide for handicapped children while similar provision is not made for others.* We therefore begin with the proposition that providing an ESY is the exception and not the rule ... [A] child's educational progress 'can be understood as a continuum where the point of regression versus progress is less relevant than the conferral of benefit.' ... Whatever the child's handicap and potential, however, the inquiry is essentially the same. If the child benefits meaningfully within his potential from instruction under a proper IEP over a regular school year, then ESY service may not be required ... unless 'the benefits accrued to the child during the regular school year will be significantly jeopardized if he is not provided an [ESY].'

*Cordrey,* 917 F.2d at 1473 (emphasis added) (citations omitted). *Cordrey* acknowledges important considerations. First, the IDEA is designed to provide some educational benefit in light of the student's given potential. Second, because the IDEA focuses on an appropriate public education, it does not require a state to go beyond what is necessary to assist in that education, *which is otherwise available to non-disabled students.*

Worthy as the goal of providing unlimited services to handicapped children may be, courts must apply the [IDEA] as it was written ... 'An appropriate education is not synonymous with the best possible education ... It is also not an education which enables a child to achieve his full potential: even the best public schools lack

---

**6.** An ESY is an organized school program that extends beyond the typical 180 days school year.

the resources to enable every child to achieve his full potential....'

*Id.* at 1474 (citations and quotations omitted).

The Sixth Circuit's admonition in *Paul B.* is clear: "To assess whether a residential placement is appropriate, a determination must be made whether full time residential placement *is necessary for educational purposes as opposed to medical, social, or emotional problems that are separable from the learning process.*" *Paul B.,* 88 F.3d at 1471 (emphasis added). Daugherty's reliance on *Babb v. Knox County School System,* 965 F.2d 104, 109 (6th Cir.1992) ("Any attempt to distinguish academics from treatment when defining 'educational placement' runs counter to the clear language of the [IDEA].") does not suggest otherwise. In *Babb,* the school district undoubtedly failed to comply with the IDEA; the court described its review as facing approval of one of two options: "the school's choice of inaction ... versus the Babbs' choice of a residential program with counseling and educational services, which resulted in ... much-needed psychological care combined with daily educational programming." *Id.* at 108.

Daugherty failed to demonstrate his particular claim is anything more than a request for additional psychiatric, social, and emotional services beyond that already provided by the Grove School. It is important that Daugherty does not contest the types or adequacy of the services he did receive from the Grove School. Additionally, he did not overcome the fact of his successful graduation, which is uncontroverted evidence his "learning process" is intact. Notwithstanding his completion of a secondary school education, Daugherty also failed to describe sufficiently the services he requested as the cause of his inability to receive a FAPE; the services he seeks focused primarily on noneducational aspects of his difficulties. To grant Daugherty's claim would extend HCDE's financial liability beyond the dictates of the IDEA to provide an appropriate education.

## IV. *CONCLUSION*

The Court finds Daugherty did not meet his burden under the summary judgment standard of review. Giving proper deference to the ALJ's decision, the Court will GRANT the motion for summary judgment filed by HCDE (Court File No. 18) and will DENY the motion filed by Daugherty (Court File No. 17).

An Order will enter.

### ORDER

In accordance with the accompanying Memorandum, the Court **GRANTS** the Motion for Summary Judgment filed by Defendant Hamilton County Department of Education (Court File No. 18) and **DENIES** the Brief in Support of Reversal and Remand filed by Plaintiff Steve Daugherty, Jr. (Court File No. 17). There being no other issues before the Court, this case is **DISMISSED.**

**SO ORDERED.**