RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0027P (6th Cir.)
File Name: 01a0027p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JUSTIN KNABLE, a minor by
and through his mother and
next friend Marilyn Knable,
        *Plaintiff-Appellant/*
        *Cross-Appellee,*

        *v.*

BEXLEY CITY SCHOOL
DISTRICT; and PHILLIP E.
TIEMAN, Superintendent,
Bexley Board of Education,
        *Defendants-Appellees/*
        *Cross-Appellants.*

Nos. 99-4326/4394

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 96-01159—Edmund A. Sargus, Jr., District Judge.

Argued: November 2, 2000

Decided and Filed: January 24, 2001

Before: KEITH, BOGGS, and COLE, Circuit Judges.

1

did not address it in its opinion. As such, Bexley's argument appears to be unopposed, and Superintendent Tieman should be dropped as a party to this case. *See James v. Upper Arlington City Sch. Dist.*, 228 F.3d 764, 769 (6th Cir. 2000) (holding that claims against school officials are not proper under the IDEA absent claim that officials failed to act in fulfillment of statutory duties).

### III. CONCLUSION

For the foregoing reasons, we **REVERSE** the decision of the district court and **REMAND** for further proceedings consistent with this opinion.

---

### COUNSEL

**ARGUED:** Franklin J. Hickman, HICKMAN & LOWDER, Cleveland, Ohio, for Appellant. Julie Carleton Martin, SCOTT, SCRIVEN & WAHOFF, Columbus, Ohio, for Appellees. **ON BRIEF:** Franklin J. Hickman, Janet L. Lowder, HICKMAN & LOWDER, Cleveland, Ohio, for Appellant. Julie Carleton Martin, SCOTT, SCRIVEN & WAHOFF, Columbus, Ohio, John Curtis Albert, CRABBE, BROWN, JONES, POTTS & SCHMIDT, Columbus, Ohio, for Appellees.

---

### OPINION

---

R. GUY COLE, JR., Circuit Judge. Parents of a behaviorally disabled boy brought this action under the Individuals with Disabilities Education Act ("IDEA" or "Act"), 20 U.S.C. § 1400 *et seq.*, against the Bexley, Ohio, school district ("Bexley"). The parents sought reimbursement for the costs of placing their child in private school after they withdrew him from Bexley public schools. The district court affirmed the findings of the state Impartial Hearing Officer and denied the parents' request for reimbursement. The parents appeal, arguing that the school district committed both procedural and substantive violations of the IDEA, and consequently denied their son the "free appropriate public education" to which he was entitled under the Act. For the reasons that follow, we **REVERSE** the decision of the district court and **REMAND** for further proceedings consistent with this opinion.

### E.  Issues on Cross-Appeal

Bexley raises two additional issues on cross-appeal, which may be disposed of succinctly.  First, Bexley argues that the district court erred in refusing to allow into evidence the deposition testimony of psychologist Jack Naglieri, Ph.D., on the issues of whether Bexley's proposed IEP was appropriate and whether Grove School was an appropriate placement for Justin.  The district court, mindful of the role of the administrative hearing in the IDEA relief process, rejected Bexley's proffer of that testimony on the basis that Dr. Naglieri's evaluation occurred after the IHO's hearing and could not have been considered at that hearing because he was hired by Bexley in 1997.  The district court also found that the proffered testimony was duplicative of the evidence presented by Bexley at the IHO's hearing.

In discussing the proper standard of judicial review with respect to supplementing the administrative record under the IDEA, we have said:

> [T]he reasons for supplementation [of the administrative record] will vary; they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing.  The starting point for determining what additional evidence should be received, however, is the record of the administrative hearing.

*Metro. Gov't v. Cook*, 915 F.2d 232, 234 (6th Cir. 1990) (internal quotation marks omitted).  In light of this standard, we find that the district court did not abuse its discretion in refusing to admit Bexley's additional evidence.  *See id*.

Finally, Bexley argues that the Knables cannot maintain an IDEA action against Phillip E. Tieman, the Superintendent of Bexley Schools, in his individual capacity.  The Knables do not address this question in their briefs, and the district court

## I.  BACKGROUND

### A.  Factual Background

The facts of this case are largely undisputed.  Justin Knable was born on February 3, 1982, and was adopted by Marylin and Robert Knable a few days after birth.  When Justin reached school age, his parents enrolled him in a private school, the Columbus Torah Academy.  Justin began exhibiting behavioral problems in the first grade, and thereafter began receiving therapy from a private doctor and a child psychologist associated with his school.  In early 1992, Justin was diagnosed with Attention Deficit Hyperactivity Disorder, oppositional defiant disorder, and dysthymia, and was prescribed medication for his conditions.  In June of 1992, Justin was admitted to Upham Hall, an inpatient facility at The Ohio State University, due to his aggressive behavior at home.

Justin began attending Bexley public schools in the fifth grade (the 1992-93 school year) after Justin's doctor recommended placement in a more disciplined and structured school environment.  Justin continued to demonstrate disruptive behavior while enrolled in Bexley schools.

At the beginning of Justin's sixth-grade year (1993-94), Bexley began the process of having Justin evaluated according to special education law.  As early as August 31, 1993, a Teacher Conference Summary stated, "call Knables for permission to evaluate."  Bexley officials signed a referral request on September 14, 1993, and mailed a parent-permission form on September 24, 1993.  On September 30, 1993, the Knables consented to a multi-factored evaluation of Justin.  On November 22, 1993, an evaluation team met and unanimously agreed that Justin was eligible for services for a Severe Behavior Handicap ("SBH").  Nadine Ross, the school psychologist, sent the results of the multi-factored evaluation to Justin's parents on November 23, 1993, and arranged to

meet with them to discuss the evaluation and possible placements for Justin.

Because Bexley did not have an SBH unit within the school district at that time, Ms. Ross began investigating the availability of SBH placement settings for Justin outside the school district. Ms. Ross reviewed the SBH program at the Hannah Neil Center for Children ("Hannah Neil") and learned that the program had a space for an additional SBH student.

The Knables and Bexley officials met on December 8, 1993, to discuss the results of Justin's multi-factored evaluation as well as possible placement options. Dr. Hilliard, the principal of Maryland Elementary, recommended placing Justin in the SBH program at Hannah Neil. The Knables expressed doubts about the Hannah Neil program and asked about the possibility of a residential placement for Justin. Although the Knables agreed to visit the Hannah Neil facility and signed a release form so that Bexley might send Hannah Neil information about Justin, they never actually visited or spoke with the staff at Hannah Neil. At the conclusion of the December 8, 1993, meeting, Mr. Knable stated that he "would like to see an IEP" for Justin.[1]

Five days after this meeting, on December 13, 1993, the Knables admitted Justin to Upham Hall because of aggressive behavior at home. That same day, the Knables informed Bexley that Justin had been hospitalized and requested another meeting. The next day, December 14, 1993, the Knables met with Dr. Hilliard; Dr. Anne Hyland, a psychologist in the Bexley school district; and Bill Bowman, Justin's teacher. The Knables stated that Hannah Neil was not an acceptable placement for Justin. Mr. Knable and Bexley officials agreed, however, that Bexley would work with officials at Upham Hall on Justin's educational program

---

[1] An "IEP" is an "individualized education program," which schools must provide to disabled children under the IDEA. *See* 20 U.S.C. § 1414(a)(5) (1994).

private setting of the State's choice. This is the IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims.

*Id*. at 15.[6]

In concluding that the Knables are entitled to reimbursement for the reasonable costs associated with Justin's education at Grove School, we are mindful of the Court's mandate in *Burlington* that equitable considerations are relevant in fashioning relief under 20 U.S.C. § 1415(e)(2). *See* 471 U.S. at 374. Thus, on remand, the district court "must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required." *Florence County*, 510 U.S. at 16. Total reimbursement of the costs of Justin's Grove School education will not be appropriate if the court determines such costs to be unreasonable. *See id.*; *see also Gadsby v. Grasmick*, 109 F.3d 940, 955 (4th Cir. 1997) (holding that under *Florence County*, the district court is free on remand to award reimbursement only for those costs that it deems are reasonable). In any event, it is the district court's role in the first instance to weigh the equities in this case to determine the appropriate level of reimbursement to be awarded. *See Gadsby*, 109 F.3d at 955.

---

[6] Bexley contends that school districts are not required to "maximize the potential of handicapped children" under the IDEA, *Rowley*, 458 U.S. at 189, and argues that ordering reimbursement would unfairly require the school district to provide Justin the "educational equivalent of a . . . Cadillac," *Tullahoma City Schs.*, 9 F.3d at 459. The case law to which Bexley refers, however, addresses only the question of whether a school district's proposed IEP sufficiently comports with the requirements of the IDEA. These cases do not affect our analysis of whether parents are entitled to reimbursement for the costs private placement once they have shown that the school district failed to offer an appropriate program. To the contrary, having shown that Bexley did not provide Justin a FAPE, the Knables need only demonstrate that Grove School was reasonably calculated to enable Justin to receive educational benefits. *See Florence County*, 510 U.S. at 11.

counselors, and various administrators. Class sizes are small and students participate in frequent individual and group therapy sessions. Not surprisingly, Justin made significant educational progress during his two years at Grove School. The record indicates that the frequency of Justin's inappropriate behavior significantly decreased during his first year at Grove and his grades improved dramatically.

Bexley contends that the Knables are not entitled to reimbursement because Grove School was not the "least restrictive" placement as required by the IDEA. *See* 20 U.S.C. § 1412(5); 34 C.F.R. § 300.550. We noted in *Boss*, however, that parents who have not been treated properly under the IDEA and who unilaterally withdraw their child from public school will commonly place their child in a private school that specializes in teaching children with disabilities. *See* 144 F.3d at 400 n.7. We would vitiate the right of parental placement recognized in *Burlington* and *Florence County* were we to find that such private school placements automatically violated the IDEA's mainstreaming requirement. *See id*.

Bexley further argues that reimbursement is inappropriate because it would impose substantial costs on the school district when compared to the cost of the program offered by Bexley. The Court in *Florence County* expressly rejected this argument, however, and held that once parents prove that the school district failed to offer an appropriate program, parents are entitled to reimbursement for private school placement so long as the placement was reasonably calculated to provide educational benefits. *See* 510 U.S. at 11. The Court stated:

There is no doubt that Congress imposed a significant financial burden on States and school districts that participate in the IDEA. Yet public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, or place the child in an appropriate

while he was hospitalized. During this meeting, Mr. Knable again noted that Justin had not received an IEP. Dr. Hilliard agreed that Bexley did not have an IEP for Justin, but stated that Bexley did have plans for working with Justin.

Justin remained at Upham Hall from December 13, 1993, to December 22, 1993, and continued day treatment there from January 3, 1994, to February 23, 1994. After ending his treatment at Upham Hall, Justin returned to regular educational placement at Bexley, albeit with a plan intended to deal with his bad behavior. The plan was modified after Justin threatened to run away, and after he stated that he almost slit his wrists because of embarrassment. Justin did almost no work at school, spent a great deal of time in the principal's office, and failed three of his seven subjects. He was often disrespectful to teachers and students, swore regularly, and disrupted classes by talking. Although Justin was not behaviorally out of control at school, the Knables viewed Justin's behavior at home to be explosive and uncontrollable at times.

The Knables and Bexley officials met again on April 6, 1994, and June 8, 1994, to discuss Justin's behavior and possible SBH placement. At the April 6 meeting, Mr. Knable again raised the issue of an IEP for Justin, and stated that he desired more information about an SBH placement for Justin before he would be willing to sign an IEP. At the June 8, 1994, meeting, Mr. Knable again asked when Justin's IEP would be forthcoming. Dr. Hilliard responded that Bexley would work on an IEP and get it to the Knables over the summer.

On July 6, 1994, Bexley officials met with a representative of Upham Hall, Mary Sidman, to discuss possible placements for Justin. Ms. Sidman suggested several characteristics and goals for a seventh-grade program for Justin. Dr. Hyland concluded from this meeting that the Harding School Plus program in nearby Worthington, Ohio, would satisfy the

criteria recommended by Ms. Sidman. The Knables were not present at this meeting.

Throughout Justin's sixth-grade year and the following summer, the Knables had been exploring, on their own, possible residential placements for Justin. On August 16 or 17, 1994, Mrs. Knable completed enrollment and student information forms for Grove School, a psychiatrically-oriented residential program in Connecticut. Grove School officially accepted Justin into its program on August 18, 1994, at a total cost of $51,300 per year.

Also on August 18, 1994, Mr. Knable faxed a letter to Bexley again requesting a written IEP. Dr. Hyland indicated that Bexley was considering the Harding School Plus program as a possible placement for Justin and suggested that Mr. Knable visit Harding to review the program. Mr. Knable visited Harding on August 22, 1994. At a follow-up meeting with Dr. Hyland to discuss the proposed placement at Harding, the Knables raised concerns about the short length of the school day in the program, and the requirement that they pay $80 per day in therapy costs. Mr. Knable also asked whether Bexley would pay for private residential placement in the event the Knables did not agree to Harding School Plus. According to Mr. Knable, Dr. Hyland responded negatively to this inquiry by stating, "you really don't expect that I would write a check to a private school, do you?" At the conclusion of this meeting, Mr. Knable reiterated his demand for an IEP for Justin.

Dr. Hyland faxed Mr. Knable a "draft" IEP for Justin on August 30, 1994. The draft IEP proposed services at Harding School Plus and noted that "Bexley Schools will assume costs beyond what parent insurance will cover associated with the Harding School Plus program."

On September 12, 1994, the Knables accepted Grove School's offer of admission to Justin by sending a check to guarantee Justin's place in the seventh-grade class. The

relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). Under this provision, "equitable decisions are relevant in fashioning relief," *Burlington*, 471 U.S. at 374, and courts enjoy "broad discretion" in so doing, *id*. at 369. Appropriate relief includes the reimbursement of costs associated with the private school placement of the child. *See id.*; *see also Babb*, 965 F.2d at 109 (holding that when school system violated IDEA's procedural requirements, reimbursement for costs of private placement was proper remedy). In order to receive reimbursement for private school placement, however, parents must demonstrate not only that the school district failed to provide a FAPE, but also that their own unilateral placement of the child in private school was proper. *See Boss*, 144 F.3d at 399 (citing *Florence County*, 510 U.S. at 7).

Inasmuch as the district court erroneously concluded that Bexley's proposed IEP was appropriate under the IDEA, it did not address the propriety of the Knables' placement of Justin at Grove School. In *Florence County*, the Supreme Court set forth the following standard for determining whether a unilateral placement is appropriate:

> [W]hen a public school system has defaulted on its obligations under the Act, a private school placement is "proper under the Act" if education provided by the private school is "reasonably calculated to enable the child to receive educational benefits."

510 U.S. at 11 (citations omitted). The record before us amply demonstrates that Grove School satisfies this standard.

Grove School is a residential program for adolescents located in Connecticut and certified by the Connecticut Department of Education, the Connecticut Department of Children and Families, and the American Association of Psychological Services for Children. Each student at Grove School receives a Comprehensive Service Plan developed by a team including a therapist, a psychiatrist, teacher-

In addition, Bexley's draft IEP did not offer a free program. The draft IEP stated that "Bexley Schools will assume costs beyond what parent insurance will cover." The district court and the IHO both found that the IEP required the Knables to exhaust their own insurance coverage before Bexley would pay. Due to the lifetime coverage limits for psychiatric care under the Knables' family medical insurance plan, the district court found that Bexley's proposed arrangement would result in costs to the Knables. Despite this finding, the district court did not conclude that the IEP as written denied Justin a FAPE. Rather, the district court held that, to the extent the proposed IEP imposed costs on the Knables, such charges were barred by the IDEA. As already discussed, however, a reviewing court must evaluate the propriety of the IEP based on the terms of the written offer itself, not on what the school district could have provided.

For the purposes of determining whether the Knables are entitled to reimbursement, the district court's role was to determine whether the proposed IEP provided a FAPE at the time offered. *See Union Sch. Dist.*, 15 F.3d at 1525. As defined under the IDEA, a FAPE consists of "special education and related services . . . provided at public expense, . . . and *without charge*." 20 U.S.C. § 1401(a)(18)(A) (emphasis added). By the express terms of the Act, therefore, Bexley's proposed IEP did not provide a FAPE. Inasmuch as Bexley's proposed IEP failed to meet both the technical and substantive requirements of the IDEA, it did not provide Justin a FAPE as written. The district court erred in assessing the appropriateness of the program offered by Bexley based on what Bexley might have provided, as opposed to what Bexley actually promised in the draft IEP. Standing alone, Bexley's proposal was insufficient to meet the requirements of the IDEA.

## D.  The Knables' Right to Reimbursement

When a court determines that a school district has violated a child's rights under the IDEA, it is authorized to grant "such

Knables did not respond to Bexley's "draft" IEP, nor did they inform Bexley of their decision to enroll Justin in Grove School. On September 15, 1994, Dr. Hyland wrote a follow-up letter to the Knables regarding the proposed IEP. The Knables' attorney responded by letter on September 20, 1994, and requested an IEP conference. Bexley officials did not ignore that request for an IEP conference; however, Bexley and the Knables agreed that they would not disclose the content of any subsequent meeting or meetings for purposes of this litigation.

Justin attended Grove School for two years. By the fourth marking period of the seventh grade at Grove School, he received all As and Bs on his report card.

### B.  Procedural Background

On January 31, 1995, the Knables formally requested a due process hearing seeking reimbursement for the costs of placing Justin at Grove School. An Impartial Hearing Officer ("IHO") conducted a four-day hearing in September of 1995 and made the following findings in a decision rendered in June of 1996:

1.  The Knables have prevailed in establishing that Bexley did not convene an IEP conference.

2.  Bexley has prevailed in establishing that it can provide a free appropriate public education to meet Justin's specific needs. Bexley is not responsible to pay the costs of placing Justin at Grove School or at any other residential facility.

3.  The Knables have prevailed in establishing that any charges for services provided to Justin under the proposed IEP that would reduce the family's lifetime coverage limits under their family medical insurance would deprive Justin of a free education and are therefore impermissible. Neither the Knables nor their

family medical insurer are responsible to pay such charges.

4.    Bexley has prevailed in establishing that a residential placement is not required to provide a [free appropriate public education] to Justin.

Both parties requested a state level administrative review of the IHO's decision. On October 11, 1996, a State Level Review Officer ("SLRO") reversed the decision of the IHO due to its purported conflict with *Wise v. Ohio Department of Educaction*, 80 F.3d 177 (6th Cir. 1996), and dismissed the case. The Knables appealed the SLRO's ruling to the United States District Court for the Southern District of Ohio. Bexley then moved to dismiss the action under Fed. R. Civ. P. 12(b)(6), arguing that, under *Wise*, the Knables had waived their right to reimbursement because they did not request a due process hearing prior to placing Justin in Grove School. The district court denied Bexley's motion to dismiss, finding that *Wise* was factually distinguishable from the present case, relying in part on *School Committee of Burlington, Mass. v. Department of Education*, 471 U.S. 359 (1985), and *Florence County School District Four v. Carter*, 510 U.S. 7 (1993).

In light of the district court's order effectively overruling the SLRO's decision for purposes of determining whether the Knables had presented a claim for which relief could be granted, the parties stipulated that the district court's basis for review would be the decision of the IHO. Following a period of briefing and motions, the district court issued its opinion affirming the decision of the IHO in its entirety.

description of the specific educational services to be provided, a statement of needed transition services to be provided, the projected date of initiation of the program, and its expected duration. *See* 20 U.S.C. § 1401(a)(20). Applicable federal regulations further provide that the written offer required by § 1415(b)(1)(C) must include an explanation of the parents' procedural safeguards, an explanation of the school district's proposed actions, and a description of the evaluations and other records on which the agency based its proposal. *See* 34 C.F.R. § 300.505. Under both the IDEA and interpretive case law, the IEP embodied in such a written offer must provide services that are individualized to the child's needs. *See* 20 U.S.C. § 1401(a)(20); *Union Sch. Dist.*, 15 F.3d at 1525.

Bexley's draft IEP does not meet the requirements of the IDEA or its associated regulations. It does not contain a summary of the Knables' procedural rights. It fails to explain the options Bexley considered and the reasons why those options were rejected. It does not describe the evaluations, procedures, tests, records, or reports that Bexley used as a basis for its proposal. *See* 34 C.F.R. § 300.505. Nor does the draft IEP substantially satisfy the requirements of 20 U.S.C. § 1401(a)(20). *See* 30 C.F.R. pt. 300, app. C., cmts. 36-44 (discussing what should be included in the statement of the child's present performance levels, the goals and objectives to be achieved, and the special educational and related services to be offered). Rather, Bexley's draft IEP is just that -- a draft. It is a generalized proposal of behavioral and educational goals for Justin, with minimal details describing how the Harding School Plus program would help Justin meet such goals. The proposed program was developed by Bexley based on general information received from Harding, rather than on specific information concerning which services would best meet Justin's individual needs. Dr. Hyland, the author of the draft IEP, repeatedly stated that the document sent to the Knables was "not an IEP." Bexley's expert witness, Dr. James Christopher, also testified that he "would want more" than the program embodied in the draft IEP to address Justin's behavioral and educational problems.

proposed IEP were the Knables' fault inasmuch as "Bexley offered 'continuing and abundant opportunities to the Knables to be involved in fashioning an IEP. . . .'"

The district court erred in relying on the IHO's finding that Bexley had the capacity to offer Justin an appropriate program. The district court should have limited its assessment to the terms of the draft IEP document itself. Although there was evidence in the record indicating what could have been provided at Harding, only those services identified or described in the draft IEP should have been considered in evaluating the appropriateness of the program offered. *See id.* at 1525-26 (considering only written placement offer in assessing appropriateness of program offered by school district); *see also Burilovich v. Bd. of Educ. of Lincoln Consol. Schs.*, 208 F.3d 560, 568 (6th Cir.) (holding that oral proposal by school district about what could be offered is not an IEP), *cert. denied*, 121 S. Ct. 380 (2000); *Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss*, 144 F.3d 391, 398 (6th Cir. 1998) (rejecting school district's argument that proposed IEP was "first draft" that would have been further developed had parents continued dialogue with school); *Briere v. Fair Haven Grade Sch. Dist.*, 948 F. Supp. 1242, 1256 (D. Vt. 1996) (finding that issue before the court was whether proposed IEP complied with the IDEA, not whether an IEP might have been developed that would have complied). Moreover, as discussed previously, the Knables' refusal to agree on a proposed placement for Justin does not justify Bexley's noncompliance with the IDEA. Thus, the only offer of placement that was appropriately before the district court was that specified in Bexley's draft IEP dated August 30, 1994.

### 2. Bexley's proposed IEP did not offer an appropriate program

Under the IDEA, an IEP must include a statement of the child's present levels of educational performance, a statement of annual goals and short-term instructional objectives, a

## II.  DISCUSSION

### A.  Overview of the IDEA[2]

#### 1.  Statutory framework

In exchange for federal funding, the IDEA requires states to identify, locate, and evaluate "all children residing in the State who are disabled . . . and who are in need of special education and related services . . . ." 20 U.S.C. § 1412(2)(C) (1994). States must provide all such disabled children a "free appropriate public education" ("FAPE"), 20 U.S.C. § 1401(a)(18), and school districts receiving funds under the IDEA must establish an IEP for each child with a disability, *see* 20 U.S.C. § 1414(a)(5). Congress defined an IEP as follows:

> [A] written statement for each child with a disability developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities, the teacher, the parents or guardian of such child, and, whenever appropriate, such child . . . .

20 U.S.C. § 1401(a)(20). Under the Act, the IEP must contain a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress. *See id*. The meeting to develop an IEP must be held within thirty calendar days of a

---

[2] The IDEA was amended effective June 4, 1997, *see* Pub. L. No. 105-17, Tit. II, § 201(a)(2)(C), 111 Stat. 37, 156 (1997), and these amendments have prospective application only. *See Tucker v. Calloway County Bd. of Educ.*, 136 F.3d 495, 500-01 (6th Cir. 1998). The actions in this case cover periods under the prior law, and citations are to the prior law unless otherwise noted.

determination that the child needs special education and related services. *See* 34 C.F.R. § 300.343(c) (1995). Placement decisions must be based on the IEP. *See* 34 C.F.R. pt. 300, app. C., cmt. 5. Furthermore, the IDEA requires the school district to review the IEP at least annually and to make any necessary revisions to ensure that the child is receiving an appropriate education. *See* 20 U.S.C. § 1415(a)(5). Finally, the IDEA mandates that children with disabilities be educated with non-disabled children "to the extent appropriate." 20 U.S.C. § 1412(5); 34 C.F.R. § 300.550.

## 2. Relief under the IDEA

The IDEA provides a process through which parents who disagree with the appropriateness of an IEP can seek relief. The process begins with a complaint to the school district, followed by a due process hearing at which parents are able to voice their concerns to an IHO of the state educational agency, as determined by state law. *See* 20 U.S.C. § 1415(b). Any party may appeal the result of this hearing to an SLRO. *See* 20 U.S.C. § 1415(c). Finally, any party aggrieved by the result of the hearing held before the SLRO may bring suit in the appropriate state court or federal district court. *See* 20 U.S.C. § 1415(e)(2).

During the course of such proceedings, parents and the school are required to continue the then-current educational placement of the child as set forth in the current IEP. *See* 20 U.S.C. § 1415(e)(3)(A). If, however, parents opt not to comply with this so-called "stay-put" provision, they are not necessarily barred from recovering the costs of private placement. Rather, parents who elect to remove their child from public school prior to completion of the IDEA review process, and pay for appropriate specialized education themselves, may seek reimbursement for the amounts expended. *See Burlington*, 471 U.S. at 370. Parents are entitled to such retroactive reimbursement "only if a federal court concludes both that the public placement violated the IDEA, and that the private school placement was proper under

the IDEA, we nonetheless would conclude that Bexley's proposed IEP of August 30, 1994, failed to provide a FAPE to Justin. As previously discussed, the second prong of *Rowley* requires this Court to determine whether Bexley's proposed IEP was reasonably calculated to enable Justin to receive educational benefits. *See* 458 U.S. at 206-207. The party challenging the terms of an IEP bears the burden of proving that it is inappropriate. *Cordrey*, 917 F. 2d at 1469.

### 1. Bexley's draft IEP must be evaluated as written

As an initial matter, we note that we must limit our evaluation of Bexley's proposed IEP to the terms of the document itself, as presented in writing to the Knables. The IDEA specifically requires school districts to provide parents a formal written offer before either initiating a placement for a disabled child or otherwise providing a FAPE to the child. *See* 20 U.S.C. § 1415(b)(1)(C). In discussing the importance of the formal written offer requirement, the Ninth Circuit has noted that the requirement is not merely technical, but rather serves the important purpose of creating a clear record of the educational placement and other services offered to the parents. *See Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994). The written offer not only helps to eliminate factual disputes between the school district and parents about proposed placements, but also "greatly assists parents in presenting complaints with respect to any matter relating to the . . . educational placement of the child." *Id.* (internal quotation marks omitted). The written offer requirement should therefore be enforced rigorously. *See id.*

The district court expressly addressed the question of whether Bexley's proposed IEP offered an appropriate program for Justin and agreed with the IHO's assessment of the quality of the proposed IEP and the Harding School Plus program, holding that "Bexley *could* have provided a free appropriate public education to meet Justin's specific needs . . . ." (emphasis added). The district court suggested that any unanswered questions resulting from deficiencies in the

## C.  Substantive Violations

Having concluded that, under the first prong of *Rowley*, Bexley denied Justin a FAPE by virtue of its procedural violation of the IDEA, we need not determine whether the draft IEP proposed by Bexley offered Justin an appropriate program. The IDEA's procedural framework clearly provides that there can be no IEP unless an IEP conference is conducted first. *See* 20 U.S.C. § 1401(a)(20); 34 C.F.R. § 300.343(c); 34 C.F.R. pt. 300, app. C; O.A.C. § 3301-51-02(E). Because Bexley never convened an IEP conference, the "draft" IEP that Bexley presented to the Knables on August 30, 1994, cannot properly be considered an IEP for the purposes of *Rowley*.

In *Babb*, this Court applied the first prong of *Rowley* and concluded that the school district failed to adhere to the procedural requirements of the Act. *See* 965 F.2d at 107. Specifically, *Babb* found that the school district failed to conduct a proper evaluation of the child and, consequently, failed to provide the child with an IEP. *See id.* The Court then turned to the second prong of the *Rowley* analysis and stated:

> [T]he school did not create an individualized educational program for Jason and did not meet Jason's specialized needs. Had the school properly complied with the Act's requirements . . . , the Babbs and the school system could have worked together to design a proper plan to best meet Jason's needs. The wisdom of hindsight in this instance, however, provides hollow comfort.

*Id.* at 108. As in *Babb*, the school district in this case failed to comply with the procedural requirements of the IDEA, resulting in a substantive deprivation of Justin's rights. As a consequence, there is no IEP for this Court to review under the second prong of *Rowley*.

However, even if we were to assume that Bexley substantially complied with the procedural requirements of

the Act." *Florence County*, 510 U.S. at 15. Thus, parents who unilaterally remove their child from public school prior to completion of the IDEA review process "do so at their own financial risk." *Id.* (citing *Burlington*, 471 U.S. at 373-74).

When parents challenge the appropriateness of a program or placement offered to their disabled child by a school district under the IDEA, a reviewing court must undertake a twofold inquiry. *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982). First, the court must ask whether the school district has complied with the procedures set forth in the IDEA. *See id.* Second, the court must determine whether the IEP, developed through the IDEA's procedures, is reasonably calculated to enable the child to receive educational benefits. *See id.* There is no violation of the IDEA so long as the school district has satisfied both requirements. *See id.*

### 3.  Standard of review

The IDEA's provision governing federal court review of state administrative decisions states that: "In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). The Supreme Court has construed this provision to mean that initial reviewing courts should make "independent decisions" based on the preponderance of the evidence, but also should give "due weight" to the determinations made during the state administrative process. *See Rowley*, 458 U.S. at 206. Although reviewing courts must not "simply adopt the state administrative findings without an independent re-examination of the evidence," *Doe v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 387 (6th Cir. 1998), neither may they "substitute their own notions of sound educational policy for those of the school authorities which they review," *Doe v. Bd. of Educ. of Tullahoma City*

*Schs.*, 9 F.3d 455, 458 (6th Cir. 1993) (quoting *Rowley*, 458 U.S. at 206).

According to this "modified" *de novo* standard of review, a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings. *See Tucker*, 136 F.3d at 503. This court, in turn, applies a clearly erroneous standard of review to the district court's findings of fact, and a *de novo* standard of review to its conclusions of law. *See id.*

### B.   Procedural Violations

Under the first prong of *Rowley*, we must determine whether Bexley has violated the procedural requirements of the IDEA. Even if we conclude that Bexley did not comply with the Act's procedural requirements, such a finding does not necessarily mean that the Knables are entitled to relief. Rather, we must inquire as to whether the procedural violations have caused substantive harm to Justin or his parents. *See Metro. Bd. of Pub. Educ. v. Guest*, 193 F.3d 457, 464-65 (6th Cir. 1999); *Daugherty v. Hamilton County Schs.*, 21 F. Supp. 2d 765, 772 (E.D. Tenn. 1998). Only if we find that a procedural violation has resulted in such substantive harm, and thus constituted a denial of Justin's right to a FAPE, may we "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2).

### 1.   Bexley failed to convene an IEP conference

As discussed *supra*, regulations enacted pursuant to the IDEA require a school district to convene a meeting to develop an IEP for a child within thirty calendar days of the determination that the child needs special education and related services. *See* 30 C.F.R. § 300.343(c). This time limit ensures that there will not be a significant delay between the time the child is evaluated and the time the child begins to receive special education. *See* 34 C.F.R. pt. 300, app. C, cmt. 7. In addition, Ohio administrative regulations require school

---

*Rowley*, 458 U.S. at 201. Without an IEP in place, Justin's behavior and academic performance suffered. Justin's inappropriate behavior became more frequent over the course of his sixth-grade year and his academic performance deteriorated. Bexley's failure to convene an IEP conference thus resulted in Justin losing educational opportunity.[4] *See Babb*, 965 F.2d at 108. Because Bexley's failure to convene an IEP conference both denied the Knables the opportunity to participate meaningfully in the IEP process and resulted in the loss of educational opportunity for Justin, we hold that the district court erred in concluding that Bexley's procedural violation did not constitute a denial of a FAPE under the IDEA.[5]

---

[4] The IHO found that Justin's final grades for the sixth grade "clearly establish that the year was not a loss," and pointed to Justin's subsequent success at Grove School as evidence that he had received "a firm educational base" while at Bexley. These conclusions are not supported by the record, however. In the final grading period of his sixth-grade year at Bexley, Justin received Fs in writing, spelling, and mathematics, Ds in reading and social studies, and Cs in science and health. Moreover, the improvement that Justin displayed in seventh grade while at Grove School highlights Justin's responsiveness to a program that effectively addressed his educational and behavioral needs, needs not adequately addressed while he was at Bexley.

[5] Bexley suggests that the Knables' reference to Justin's sixth-grade year (1993-94) is inappropriate inasmuch as the Knables' due process request challenges only the adequacy of the IEP proposed by Bexley for Justin's seventh-grade year (1994-95). It is true that the Knables' due process request did not concern Justin's performance in 1993-94. Inquiry into Justin's performance during the 1993-94 school year is proper, however, for the purpose of determining whether Bexley's failure to convene an IEP conference resulted in a substantive violation of Justin's rights. If so, Bexley has denied Justin a FAPE and the Knables are entitled to relief. Moreover, Bexley admits that Justin's performance during the 1993-94 school year is relevant in assessing the school district's proposed IEP for Justin's seventh-grade year. Finally, Bexley's failure to convene an IEP conference during the 1993-94 school year denied Justin's parents a meaningful opportunity to participate in the development of the proposed IEP covering the 1994-95 school year. Thus, reference to Justin's sixth-grade year is appropriate.

We review the district court's conclusion *de novo*, *see Tucker*, 136 F.3d at 503; *W.G.*, 960 F.2d at 1483 (holding question of whether child was denied FAPE is mixed question of law and fact that is reviewed *de novo*), and find that it is not borne out by the record. It is true that Bexley met with the Knables on several occasions to discuss Justin's behavioral problems and to review possible placement options for him. The record also reflects that Bexley worked with the Knables to ease Justin's transition from Upham Hall back to Bexley in February 1994. Such cooperation, however, is not the equivalent of providing parents a meaningful role in the process of formulating an IEP.

As discussed above, Bexley never convened an IEP conference for Justin. As a result, the Knables never were able to participate in an IEP conference. The IEP conference is the primary opportunity for parental involvement in the process of developing an IEP. *See* 34 C.F.R. § 300.345(a); 34 C.F.R. pt. 300, app. C, cmt. 26 (stating that parents are intended to be "equal participants" and to play an "active role" in the IEP conference); *see also Doe v. Defendant I*, 898 F.2d 1186, 1191 (6th Cir. 1990) ("Adequate parental involvement and participation in formulating an IEP . . . appear to be the Court's primary concern in requiring that procedures be strictly enforced."). Bexley's assertion that the school district was unable to conduct an IEP meeting until the Knables had agreed to a placement for Justin does not excuse its failure to conduct an IEP conference. Because there was no IEP conference, Mr. and Mrs. Knable were denied any meaningful opportunity to participate in the IEP process. *See W.G.*, 960 F.2d at 1484.

Moreover, the absence of an IEP at any time during Justin's sixth-grade year caused Justin to lose educational opportunity. Because Bexley never convened an IEP conference for Justin during the 1993-94 school year, Justin had no IEP at all during that year. Consequently, Justin did not have "access to specialized instruction and related services" that were "individually designed to provide educational benefit."

districts to conduct an IEP conference "as soon as possible," and, in any event, not more than ninety days after a child's parents consent to a multi-factored evaluation, or one hundred twenty days after school officials initially suspect the child as having a handicap, whichever comes first. *See* Ohio Admin. Code ("O.A.C.") § 3301-51-02(E)(1)(c) (2000).[3]

Inasmuch as the Knables consented to Justin's multi-factored evaluation on September 30, 1993, Bexley was required to conduct an IEP conference for Justin no later than December 29, 1993. Bexley failed to do so. Bexley contends that the December 8, 1993, meeting between Bexley officials and the Knables was an IEP conference "for all intents and purposes." The district court found that that meeting was a "precursor" to an IEP conference but that it did not legally constitute an actual IEP conference. The record indicates that the purpose of the December 8, 1993, meeting was to inform the Knables of the results of Justin's multi-factored evaluation and to discuss Bexley's determination that Justin was suffering from a severe behavior handicap. There is no indication that the parties addressed the additional agenda items that comprise a formal IEP conference under the applicable regulations. *See* 34 C.F.R. § 300.343; 34 C.F.R. pt. 300, app. C., cmts. 7-35; O.A.C. § 3301-51-02(E)(1)(d). Specifically, there was no determination of the nature and degree of special education intervention needed for Justin, and no decision as to an educational placement for Justin. *See* O.A.C. § 3301-51-02(E)(1)(d). Moreover, the meeting did not result in the production of an IEP document for Justin. *See id*. Rather, Bexley merely encouraged the Knables to consider the Hannah Neil program as a possible placement for Justin. Thus, the district court did not err in finding that the December 8, 1993, meeting was not an IEP conference.

-----

[3]It is unclear whether, under certain circumstances, the Ohio regulations may grant school officials a longer time period in which to conduct the IEP conference than that afforded by the federal regulations. Inasmuch as Bexley failed to comply even with the longer time limit provided by the Ohio regulations, we need not address this issue.

Bexley argues, in the alternative, that even if it failed to convene an IEP conference for Justin within the applicable time period, such failure was due to the Knables' lack of cooperation with school officials. Bexley asserts that it was unable to convene a formal IEP conference until the Knables tentatively agreed to a proposed placement for Justin. Bexley felt that such a tentative agreement on the part of the Knables was required before an IEP conference could be convened because it believed that a representative from the proposed placement had to be present at the IEP conference under the governing administrative regulations. Bexley thus argues that because the Knables refused to agree with school officials even tentatively about any proposed placements for Justin, the Knables effectively prevented Bexley from convening a formal IEP conference.

Bexley's argument fails, however. Although it is true that the regulations to which Bexley refers provide for the involvement of a representative from the proposed placement in the development of the IEP, *see* 34 C.F.R. § 300.348(a)(2); O.A.C. § 3301-51-02(D)(4), nowhere in the regulations is it required that the parents of a disabled child agree with the school district's proposed placement *before* an IEP conference can be held. To the contrary, the regulations expressly provide for the development of an IEP without parental involvement. *See* 34 C.F.R. § 300.345(d); 34 C.F.R. pt. 300, app. C., cmt. 29; O.A.C. § 3301-51-02(E)(3); *see also Cordrey v. Euckert*, 917 F.2d 1460, 1467 (6th Cir. 1990) (discussing proper procedure when school district is unable to convince parents to attend IEP conference). Bexley's position that it could not convene an IEP conference until it obtained the Knables' tentative approval of a proposed placement for Justin was erroneous, therefore, and does not justify Bexley's failure to conduct the IEP conference.

Thus, we find that the district court's conclusion that Bexley failed to convene an IEP conference for Justin was correct.

### 2. Bexley's procedural violation denied Justin a FAPE

This conclusion does not end our analysis, however. As discussed *supra*, a procedural violation of the IDEA is not a *per se* denial of a FAPE; rather, a school district's failure to comply with the procedural requirements of the Act will constitute a denial of a FAPE only if such violation causes substantive harm to the child or his parents. *See Guest*, 193 F.3d at 464-65; *Daugherty*, 21 F. Supp. 2d at 772. Substantive harm occurs when the procedural violations in question seriously infringe upon the parents' opportunity to participate in the IEP process. *See W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir. 1992). In addition, procedural violations that deprive an eligible student of an individualized education program or result in the loss of educational opportunity also will constitute a denial of a FAPE under the IDEA. *See Babb v. Knox County Sch. Sys.*, 965 F.2d 104, 109 (6th Cir. 1992); *W.G.*, 960 F.2d at 1484.

Here, the district court found that Bexley's failure to convene an IEP conference did not constitute a substantive deprivation of Justin's rights under the IDEA. Specifically, the district court held that, "based on a preponderance of evidence in the record, any procedural violations committed by Bexley or the aggregation of the violations did not result in the denial of an FAPE." In reaching its conclusion, the district court emphasized that Bexley had afforded the Knables opportunities to become involved in the process of formulating an IEP for Justin. The court also pointed to the cooperation between Bexley officials and the Knables during Justin's hospitalization at Upham Hall between January 1993 and February 1994. In light of these facts, the district court concluded that Bexley's failure to convene an IEP conference did not seriously infringe on the Knables' opportunity to participate in the IEP process or deny Justin educational opportunity.